# United States Court of Appeals

## For the First Circuit

No. 05-1889

MARÍA G. ABREU, et al.

Plaintiffs, Appellants,

v.

THE UNITED STATES, DONALD H. RUMSFELD, Secretary of Defense,
ROBERT B. PIRIE, Acting Secretary of the Navy,
GENERAL JAMES JONES, Commander of the Marine Corps

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José Antonio Fusté, U.S. District Judge]

---

Before

Boudin, Chief Judge,
Torruella and Dyk[*], Circuit Judges.

---

Carl E. McAfee and Celina Romany Siaca, with whom Celina Romany Law Offices was on brief, for appellants.
Mark B. Stern, with whom Peter D. Keisler, H.S. García, Gregory G. Katsas and Alisa B. Klein were on brief, for appellees.

---

November 14, 2006

---

[*]Of the Federal Circuit, sitting by designation.

**DYK, Circuit Judge.** This is a suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680 (2000). The plaintiffs, Abreu et al., sought money damages from the United States for personal injuries and property damage allegedly caused by the United States Navy's operation of the Atlantic Fleet Weapons Training Facility ("AFWTF") on Vieques Island, Puerto Rico. Acevedo, et al. v. United States, Abreu, et al. v. United States, Nos. 04-1232, -1372 (D.P.R. Apr. 25, 2005) (consolidated). The United States District Court for the District of Puerto Rico dismissed their claims for want of subject matter jurisdiction, holding that the claims were barred by the FTCA's discretionary function exception, 28 U.S.C. § 2680(a). We affirm.

**I.**

**A.**

The FTCA provides a limited waiver of the federal government's sovereign immunity for claims of "injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). "[F]or liability to arise under the FTCA, a plaintiff's cause of action must be 'comparable' to a 'cause of action against a private citizen' recognized in the jurisdiction where the tort occurred, and his

-2-

allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action." Dorking Genetics v. United States, 76 F.3d 1261, 1266 (2d Cir. 1996) (quoting Chen v. United States, 854 F.2d 622, 626 (2d Cir. 1988)).

Even where the government conduct would create state tort liability in a suit against a private party, the FTCA provides that sovereign immunity is not waived if the challenged governmental action involved the exercise of discretion. 28 U.S.C. § 2680(a). This provision is known as the discretionary function exception. In general, that exception, in turn, is inapplicable if the government action is contrary to the requirements of Federal law. United States v. Gaubert, 499 U.S. 315, 324-25 (1991). This case primarily concerns the scope of the exception to the discretionary function exception.

**B.**

This court described the history, layout, and operation of the AFWTF in detail in Romero-Barceló v. Brown, 643 F.2d 835 (1st Cir. 1981). We review that background only briefly here.

The United States Navy acquired land and built facilities on Vieques Island between 1941 and 1943. Initially, the Navy used the Vieques facilities primarily to conduct Atlantic Fleet Marine Force maneuvers and training. In 1960, the Navy began using live munitions in naval gunfire and air-to-ground targeting exercises on Vieques. In 1973, additional live-ammunition weapons training

-3-

exercises were transferred from Culebra Island (also off the coast of Puerto Rico) to Vieques. Along with the various training facilities, the Navy operated an open burning/open detonation facility at the AFWTF. The open burning/open detonation facility, located on the easternmost end of Vieques, was used to detonate or otherwise incinerate unused ordinance that was stored on the western end of the Island. Concerned with the environmental impact of the AFWTF, in 1977, the government of Puerto Rico initiated litigation which eventually resulted in a district court order requiring the Navy to comply with certain federal environmental statutes, including the Clean Water Act, 33 U.S.C. §§ 1251-1357 (2000), and the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., in operating the AFWTF.[1] The Navy obtained an interim permit for the AFWTF in 1980.

In September 1983, the Navy and the government of Puerto Rico executed a memorandum of understanding in which the Navy agreed to make certain changes. On January 10, 2000, the United States Environmental Protection Agency ("EPA") issued, with the Navy's consent, an order requiring certain changes at the AFWTF. The EPA made compliance with the consent order a condition for final issuance of a permit that the Navy was required to obtain

---

[1] Romero-Barceló v. Brown, 478 F. Supp. 646 (D.P.R. 1979), aff'd in part, vacated in part, Romero-Barceló v. Brown, 643 F.2d 835 (1st Cir. 1981), rev'd on other grounds, Weinberger v. Romero-Barceló, 456 U.S. 305 (1982).

under the federal Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. § 6901 et seq. The Navy needed to obtain a final permit in order to continue to operate the open burning/open detonation facility in compliance with the statute. In May 2000, the Navy discontinued live-fire exercises at the AFWTF. On April 30, 2003, the Navy terminated all military exercises on Vieques Island.

The plaintiffs, residents of Vieques, filed suits against the United States under the FTCA on March 19 and April 27, 2004. They alleged that the Navy's past military exercises and waste disposal activities at the AFWTF had exposed them to hazardous substances such as Agent Orange, depleted uranium, napalm, and other ordinance with explosive components, as well as harmful noise pollution. The plaintiffs sought damages for physical injury, emotional distress and property damage. The district court consolidated the actions.

On February 5, 2005, the district court rejected the government's contention that the suits were time-barred under the FTCA's two-year statute of limitations, 28 U.S.C. § 2401(b). The court held that the suits were timely despite the fact that the allegedly harmful governmental actions occurred more than two years before the administrative complaints were filed, concluding that the plaintiffs had alleged "continuing violations." However, the court also held that the continuing tort theory did not allow the plaintiffs to recover damages for injuries sustained more than two

years before the administrative complaints were filed.

On April 22, 2005, the district court granted the government's motion to dismiss for lack of subject matter jurisdiction. With respect to the claims that plaintiffs pursue on appeal, the district court concluded that jurisdiction was lacking because the Navy's allegedly harmful conduct was within the discretionary function exception.[2] In the alternative the court concluded that even if the discretionary function did not apply, the plaintiffs' claims nevertheless failed because the plaintiffs had not established any causal connection between the governmental conduct and their injuries. Finally, the district court denied the plaintiffs' request for discovery, concluding that additional discovery would serve no purpose in light of the court's jurisdictional determination.

The plaintiffs timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291 (2000).

## II.

We address first the plaintiffs' challenge to the district court's determination that the discretionary function exception applies.

---

[2] Plaintiffs made several claims in the district court that they do not raise on appeal, including claims under the Endangered Species Act, 16 U.S.C. § 1531 et seq., claims relating to the Navy's transfer of military exercises from Culebra Island to Vieques, and claims that the government is directly liable under RCRA and the Clean Water Act.

**A.**

In a suit under the FTCA, the district court's jurisdiction is limited by 28 U.S.C. § 1346(b). Only claims properly within the scope of the FTCA's waiver of sovereign immunity in 28 U.S.C. § 2674 are cognizable. Another provision lists the exceptions to FTCA liability, and provides that if one of the exceptions applies, "[t]he provisions of . . . section 1346(b) of this title shall not apply." 28 U.S.C. § 2680. One such exception is the discretionary function exception, which provides that sovereign immunity is not waived for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Thus, if the discretionary function exception applies, the jurisdictional grant of section 1346(b) does not, such that "the [government] is completely immune from suit, and the claim must be dismissed for lack of subject matter jurisdiction." Santoni v. Potter, 369 F.3d 594, 602 (1st Cir. 2004) (citing Kelly v. United States, 924 F.2d 355, 360 (1st Cir. 1991)).[3]

---

[3] The Supreme Court's recent decision in Arbaugh v. Y & H Corp., 126 S. Ct. 1235, 1245 (2006), confirms that dismissal for lack of subject matter jurisdiction is appropriate "[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional."

-7-

**B.**

The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empressa de Viacao Aerea Rio Grandense ("Varig Airlines"), 467 U.S. 797, 808 (1984). Congress, in enacting the discretionary function exception, intended to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 814. In determining whether conduct involves a discretionary function, we first ask whether "the conduct itself [is] discretionary." Montijo-Reyes v. United States, 436 F.3d 19, 24 (1st Cir. 2006) (internal quotation marks omitted); see also Irving v. United States, 162 F.3d 154, 162 (1st Cir. 1998) (en banc); Wood v. Unites States, 290 F.3d 29, 36 (1st Cir. 2002). To be discretionary, the conduct must involve "an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322 (1991) (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)); see also Dalehite v. United States, 346 U.S. 15, 34 (1953).

Assuming that the challenged conduct "involves an element of judgment," we next consider "whether that judgment is of the kind that the discretionary function exception was designed to

shield." Berkovitz, 486 U.S. at 536; see also Varig Airlines, 467 U.S. at 813. In other words we ask whether "the exercise of discretion involve[s] (or is [] susceptible to) policy-related judgments." Montijo-Reyes, 436 F.3d at 24; see also Irving, 162 F.3d at 162.

The district court held, and the plaintiffs do not contest, that "the military activities carried out by the Navy on Vieques over the past several decades have involved discretionary decision-making of the most fundamental kind," requiring "balancing competing concerns of secrecy and safety, national security and public health." Thus it is undisputed that the discretionary function exception generally precludes FTCA claims based on the Navy's operation of the AFWTF.

This is not, however, the end of the inquiry. The plaintiffs point out that the discretionary function exception generally does not apply if the activity in question violates a mandatory federal law. Gaubert, 499 U.S. at 324. In such circumstances the exercise of discretion is precluded. The plaintiffs argue that the Navy violated mandatory directives imposed by federal statutes, the Clean Water Act, 33 U.S.C. §§ 1251-1357 (2000) ("CWA"), RCRA, and the Noise Control Act, 42 U.S.C. §§ 4901-4918(2000) ("NCA").

## C.

It has long been established under the FTCA that actions

by a government employee complying with a mandatory policy directive are protected by the discretionary function exception. Dalehite, 346 U.S. at 36; Varig Airlines, 467 U.S. at 820. In Dalehite, the Court held that the discretionary function exception protected the conduct of government employees who participated in the production and dissemination of a fertilizer that exploded, reasoning that the exception must shield the action of subordinates implementing a regulatory plan because otherwise, each action by a subordinate could potentially give rise to governmental liability, and the exception would "fail at the time it would be needed." 346 U.S. at 36. The Varig Airlines Court similarly shielded the FAA's implementation of a spot-check plan and the actions of employees carrying out the plan, reasoning that the agency had discretion to implement the plan and that the actions of the employees carrying it out reflected the agency's policy choices. 467 U.S. at 819-20.

In Berkovitz v. United States, 486 U.S. 531 (1988), the Court addressed for the first time the question whether failure to comply with such a directive made the discretionary function exception inapplicable. The Court held that the discretionary function exception did not shield the actions of employees of the Food and Drug Administration and the National Institutes of Health who licensed a vaccine in violation of mandatory requirements. The Court held that this claim "does not challenge a discretionary function. Rather, the claim charges a failure on the part of the

agency to perform its clear duty under federal law.  When a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply."  Id. at 544.

Thereafter the Supreme Court returned to the issue in United States v. Gaubert.  499 U.S. 315 (1991).  That case involved a claim by the directors of a thrift institution that the Federal Home Loan Bank Board, pursuant to the Home Owner's Loan Act of 1933, 12 U.S.C. §§ 1461-1470, had negligently supervised the thrift, causing it to incur losses.  The Gaubert Court reaffirmed that when an employee follows a mandatory requirement in a regulation, and when that regulation was promulgated by an agency with delegated Congressional authority to implement a statute, the agency has discretion in deciding how to implement the statute, and the conduct of the employee who obeys the regulation is protected by the discretionary function exception.  Id. at 323-24.  Thus, when "a regulation mandates particular conduct, and the employee obeys that direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation."  Id.

However, the Court also concluded that the discretionary function exception does not shield the conduct of an employee who violates a mandatory regulation.  Id.  In that situation, the employee's action cannot be deemed in furtherance of the policies

-11-

of the statute that the regulation implements. Nor does his conduct reflect a permissible exercise of the discretion that Congress delegated. Thus, "[i]f [a government] employee violates [a] mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." Id. at 324. In the circumstances of Gaubert itself, the Court concluded that the federal regulators acted in accordance with the governing regulations enacted pursuant to delegated authority to implement the Home Owners' Loan Act, and thus the discretionary function exception precluded the suit. Id. at 334.

Each of the cases invoking the rule of Gaubert has involved a suit against the United States based on the activities of federal regulators; for example in Gaubert itself, the activities of Federal Home Loan Bank Board regulators, Id. at 318-19, and in Berkovitz, the actions of Food and Drug Administration and National Institutes of Health regulators. 486 U.S. 533. The language of both Berkovitz and Gaubert appears to be directed to mandatory regulations governing the conduct of employees of the regulatory agency. Thus, in Gaubert, the Court was concerned with the situation "[w]here Congress has delegated the authority to an independent agency . . . to implement the general provisions of a regulatory statute and to issue regulations to that end." 499 U.S. at 323. See also Berkovitz, 486 U.S. at 545 (noting that "application of the discretionary function exception . . . hinges

-12-

on whether the agency officials making that determination permissibly exercise policy choice"). This is not surprising. The issue in those cases concerned the exercise of discretion by the regulators under the statutes conferring their authority, and it became important to determine whether the regulators were exercising the discretion conveyed by the regulation under their organic statute. If they were acting contrary to the regulatory scheme, they were not exercising appropriate discretion.

Here the issue is quite different. The regulated party (the Navy) is not exercising or purporting to exercise discretion under the regulatory statutes. The Navy's discretion comes from an entirely different source, namely, its authority to conduct military operations. Just as the Navy cannot claim to exercise discretion under the regulatory statutes, its discretion under military statutes likely cannot be cabined by the dictates of the regulatory statutes. In other words, we think that the rule of Gaubert may well be inapplicable to mandatory directives aimed at a regulated party, where the regulated party is not exercising discretion under the mandatory statute or regulation. We also perceive that there is a particularly strong argument for limiting the rule of Gaubert where the exercise of military authority is involved, in view of the numerous cases cautioning the courts to avoid interfering with the exercise of discretionary military authority. See, e.g., United States v. Shearer, 473 U.S. 52, 57

-13-

(1985) ("civilian court [should not] second-guess military decisions").  See also United States v. Muniz, 374 U.S. 150, 162 (1963), United States v. Brown, 348 U.S. 110, 112 (1954).

Applying the rule of Gaubert to regulated entities, as well as to regulatory entities, would create an anomaly.  If the regulators were the defendants, Gaubert would then apply only if they were acting clearly contrary to the statute or regulation.  If the regulated entities were sued, they would have been bound to follow not only the plain language of the statute or regulation, but also the interpretation of the regulatory entity under Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, 467 U.S. 837 (1984), and United States v. Cleveland Baseball Co.. 532 U.S. 200, 219 (2001).  The FTCA would become a medium for enforcing the entire regulatory scheme, including the discretionary decisions of the regulatory agency, an eventuality that Congress likely did not contemplate when it enacted the FTCA.

However, we need not decide the difficult question whether the rule of Gaubert is inapplicable to regulated parties for we conclude that the Gaubert rule is inapplicable here for other reasons.

We turn to the three statutes that plaintiffs claim were violated here.

### III.

#### A.  The Clean Water Act

Plaintiffs first rely on alleged violations of the Clean Water Act ("CWA"), 33 U.S.C. § 1251-1387 (2000).  The CWA prohibits discharging pollutants into the ocean without a National Pollutant Discharge Elimination System ("NPDES") permit.  33 U.S.C. §§ 1311(a), 1323(a).  The plaintiffs argue that the Navy was required, under the CWA, to obtain a valid NPDES permit before conducting ship-to-ship and ship-to-shore live fire exercises, because those exercises risked discharging pollutants in to the waters around Vieques.  The plaintiffs also argue that the Navy did not have a valid permit.  We conclude that the Navy had a valid NPDES permit, and thus did not violate any mandatory CWA requirement.

In United States v. Zenón-Encarnación, 387 F.3d 60, 63-64 (1st Cir. 2004), this court addressed the validity of the Navy's NPDES permit for the AFWTF.  The appellant was convicted of entering one of the AFWTF firing ranges, which the Navy had designated a "danger zone" closed to the public.  The appellant argued that the Navy lacked a valid NPDES permit, and thus that it lacked authority under the pertinent regulations to designate the area a "danger zone."  Id. at 63.  The court held that:

> The Navy received a valid NPDES permit in 1984.  That permit expired in 1989, and the Navy applied to the Environmental Protection Agency ("EPA") for a new permit.  The EPA deemed the application complete but failed to act on it.  Under the applicable regulation,

-15-

> this failure means that the 1984 permit
> continued in force despite its expiration.

Id. at 63 (internal quotations omitted).  The court affirmed the district court's conclusion that the 1984 NPDES permit continued in effect through April 9, 2002 (the date the defendant was found in the restricted area).  The district court found that the permit remained in effect until "[t]he Navy . . . formally withdrew its permit renewal application . . . in a letter dated April 21, 2003."  United States v. Zenón, 285 F. Supp. 2d 109, 115 (D.P.R. 2003), vacated on other grounds, Zenón-Encarnación, 387 F.3d at 67.

We see no basis for disagreeing with Zenón's holding that the Navy had a valid permit, nor with the district court's holding that the permit remained in effect until April, 2003.  Although the plaintiffs are not bound under the doctrines of res judicata or collateral estoppel, they make no effort to demonstrate error in the earlier cases' conclusions.  We therefore hold that the Navy's actions were in compliance with the statute; the discretionary function exception applies; and the plaintiffs' claims were properly dismissed.[4]

## B. The Resource Conservation and Recovery Act

The plaintiffs next rely on RCRA, 42 U.S.C. § 6901, et seq. (2000).  They argue that the Navy violated a mandatory RCRA

---

[4] Plaintiffs below also raised FTCA claims based on violations of the CWA requirements other than its permitting requirement.  They do not pursue these claims on appeal.

-16-

requirement by operating the open burning/open detonation facility at the AFWTF without a valid RCRA permit.

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC Western, Inc., 516 U.S. 479, 483 (1996).[5] Congress delegated to the EPA primary authority to implement and enforce the provisions of RCRA. Chicago v. Evt'l Def. Fund, 511 U.S. 328, 331 (1994) ("RCRA . . . empowers EPA to regulate hazardous wastes from cradle to grave."). Among other things, RCRA regulates "hazardous waste treatment, storage and disposal facilities" ("TSDFs"). 42 U.S.C. § 6924. A RCRA permit from the EPA is required in order to lawfully operate a TSDF. 42 U.S.C. § 6925(a). It is undisputed that the Navy's facility on Vieques qualified as a TSDF under the statute.

The parties agree that the Navy timely initiated the first step in the permit application process, and in so doing obtained "interim" permit status that allowed the Navy to operate the facility lawfully for a time. See 42 U.S.C. §§ 6925(e), 6930(a); 40 C.F.R. § 270.70(a) (2000). The primary dispute is whether the Navy timely initiated the second stage in the

_____

[5] See also H.R. Rep. No. 94-1491, pt. 1 at 3 (1976) (RCRA was enacted to address "the overriding concern of . . . the effect on the population and the environment of the disposal of discarded hazardous wastes–those which by virtue of their composition or longevity are harmful, toxic or lethal.").

-17-

permitting process.[6]  But the plaintiffs also urge that the Navy

violated RCRA in other respects.  We need not resolve these complex

questions of RCRA compliance because we conclude that the Gaubert

line of cases is inapplicable to this situation.

As we have noted earlier, where suit under the FTCA is

brought against the regulated entity there is a potential conflict

between enforcement by the agency charged by Congress with

enforcement responsibility and what amounts to indirect enforcement

of the same statutory requirements through the FTCA.  We conclude

that at a minimum, it is necessary under such circumstances to

determine whether the imposition of damages liability on the

regulated entity under the FTCA would undermine the policies of the

regulatory statute.  Indeed, Gaubert itself recognized the

important role played by the policies of the mandatory statutes.[7]

Under the FTCA, the Tucker Act and other statutes

---

[6] The question here appears to turn on whether, under the
pertinent regulations, the open burning/open detonation facility
was fairly classified as a hazardous waste "treatment" facility, as
opposed to a "land disposal" or "incinerator" facility.  See 40
C.F.R. § 260.10.  If the latter, then the second part of the Navy's
RCRA permit application was untimely, and its interim permit status
was revoked.  See 42 U.S.C. § 6925(e)(2); 40 C.F.R. § 270.73(f).
The district court found that the open burning/open detonation
facility was properly classified a "treatment" facility under the
RCRA regulations, and that consequently the Navy timely completed
the second step in the permitting process and retained its interim
permit status until the AFWTF was shut down.

[7] 499 U.S. at 324 (holding that applicability of the
discretionary function exception turns on whether challenged
conduct "will be deemed in furtherance of the policies which led to
the promulgation of the regulation").

-18-

providing remedies against the United States, the Supreme Court and the courts of appeal have repeatedly recognized that the waiver of sovereign immunity reflected in various statutes must be interpreted in light of significant policies reflected in other related federal statutes. Thus, for example, the Feres doctrine precludes a FTCA remedy for actions by the military when Congress has created an alternative remedial scheme, because the FTCA "should be construed to fit . . . into the entire statutory system of remedies against the Government to make a workable, consistent and equitable whole." Feres v. United States, 340 U.S. 135, 139 (1950). The Tucker Act has been held inapplicable where Congress has provided alternative remedies under other statutes. E.g., Lion Raisins, Inc., v. United States, 416 F.3d 1356, 1372-73 (Fed. Cir. 2005). Most pertinently, the Back Pay Act ("BPA"), allowing suit by improperly discharged federal employees for back pay, has been held inapplicable to employees who were denied a remedy under another statute--the Civil Service Reform Act ("CSRA"). United States v. Fausto, 484 U.S. 439 (1988). The Court reasoned that "[t]he CSRA established a comprehensive system" that "deliberate[ly] exclu[ded]" the employees who sought to invoke the BPA, and that allowing those employees to obtain judicial review under the BPA would undermine the "considered congressional judgment" in the CSRA to preclude such review. Id. at 448, 455.

We think that this same principle is applicable here as

well. Imposing liability under the FTCA because of the failure of a federal employee to comply with a mandatory directive is not permissible if the imposition of such liability on a regulated entity would undermine the purposes of the regulatory statute creating the mandatory directive.

In short, when evaluating plaintiffs' contentions that the violation of mandatory requirements implies a waiver of sovereign immunity under the FTCA, we must refrain from imposing liability on the government when doing so would subvert a congressional decision to preclude regulated entity liability in the statute creating the mandatory directive. This is in keeping with our obligation to construe such waivers narrowly and to resolve any ambiguity or uncertainty in favor of immunity. United States v. Williams, 514 U.S. 527, 531 (1995).[8]

Here allowing recovery of compensatory damages under the FTCA for RCRA violations would adversely affect the RCRA statutory scheme. This is not a situation in which Congress simply left unaddressed the question of damages liability under the mandatory statute. Rather, we deal here with a situation in which Congress affirmatively decided to limit the available remedies and to preclude compensatory damages. In RCRA, Congress directly addressed the role of private parties in the enforcement of the

---

[8] See also West v. Gibson, 527 U.S. 212, 222 (1999); Lane v. Pena, 518 U.S. 187, 192 (1996).

-20-

statute.  The RCRA citizen-suit provision allows "any person" to commence an action to prevent an "imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a).  The provision confers jurisdiction on district courts to "restrain" violations and order persons to "take other such action;" thus it confers jurisdiction over suits for injunctive relief.  Id.; Meghrig v. KFC Western, Inc., 516 U.S. 479, 484-85 (1996).  The district courts may also impose civil penalties for RCRA violations.  42 U.S.C. §§ 6972(a), 6928(a).

In Meghrig the Supreme Court addressed the availability of compensatory damages.  There plaintiff property owners sued former owners of the property under RCRA to recover the costs of cleaning up a petroleum contamination.  Meghrig, 516 U.S. at 481-82 (1996).  The Court noted that RCRA's "elaborate [enforcement] scheme" is directed solely toward correcting existing or future harms by restraining them, and that RCRA must be read to preclude actions for damages.  Meghrig, 516 U.S. at 484-85 (1996).  The Court found that RCRA makes clear that any private action is precluded if the "EPA or the State has commenced, and is diligently prosecuting, a separate enforcement action."  Id. at 486.  If the private actions allowed under RCRA included actions for compensatory damages, the Court reasoned, those parties with substantial grievances who were most deserving of a damages award-- the ones suing over violations grave enough to attract the

-21-

attention of State or federal regulators--would be precluded from recovery, whereas parties with grievances that were not substantial enough to warrant State or EPA enforcement, would be able to recover in damages. Id. at 486-87.[9] "Therefore, if RCRA were designed to compensate private parties for their past cleanup efforts, it would be a wholly irrational mechanism for doing so." Id. at 486.[10]

Furthermore, Congress has manifested its desire to limit RCRA damage suits against the government in particular. In 1992, the Supreme Court held that RCRA's remedial scheme did not waive the government's immunity from punitive fines imposed by state law. U.S. Dept. of Energy v. Ohio, 503 U.S. 607, 627-28 (1992). Later that year, Congress amended the RCRA citizen-suit provision to expressly waive immunity over such fines, waiving sovereign immunity for "all civil and administrative penalties and fines,

---

[9] In an analogous situation, the Supreme Court reasoned that the CSRA could not logically be read to deny judicial review to employees eligible for veterans' preference ("preferential employees"), but at the same time grant nonpreferential employees access to such review, because such a reading would undermine the preference system, result in an "inverted preference," and favor "random categories of employees." Consequently, the Court held that the CSRA precluded judicial review for nonpreferential employees. Fausto, 484 U.S. at 449-51.

[10] The Court also held that the RCRA savings clause, 42 U.S.C. § 6972(f), which allows persons to "seek . . . relief" that they may have "under any statute or common law," merely preserves causes of action under state law, and does not authorize a new substantive RCRA cause of action for damages. Meghrig, 516 U.S. at 487.

regardless of whether such penalties or fines are punitive or coercive in nature or are imposed for isolated, intermittent, or continuing violations." Pub. L. 102-386, 106 Stat. 1505 (October 6, 1992). However, Congress made it clear that, in permitting the recovery of civil fines for RCRA violations, it did "not intend . . . in any manner to authorize civil tort actions against the federal government for damages." H. Rep. No. 102-111, at 15 (1991), as reprinted in 1992 U.S.C.C.A.N. 1301.

If an action based on the FTCA were allowed here, the district court would effectively be enforcing RCRA under the guise of a FTCA claim. We think that allowing the recovery of damages in a FTCA suit, based on the violation of a mandatory permitting requirement under RCRA, would undermine the intent of Congress to preclude compensatory damages awards for RCRA violations.

There is, moreover, reason to be concerned that the FTCA suit here was specifically designed to achieve an end run around the strict limitations placed by Congress on private damages actions under RCRA. The complaint here originally alleged violations of RCRA itself.[11] While these direct RCRA claims were eventually dismissed, the plaintiffs nonetheless continued to urge that the state-law claim enforceable under the FTCA should

---

[11] In the complaint, plaintiffs stated that "[plaintiffs] are citizens covered under [RCRA]," and "24 U.S.C. § 6972(a)(1)(A) of this act [the RCRA citizen-suit provision] allows for civil actions for violation of any requirement of RCRA," and "Plaintiffs allege that the defendants have violated [RCRA]."

-23-

incorporate the RCRA standard of liability.[12]  They now seek to overcome the discretionary function exception by alleging that the Navy violated RCRA.  From a policy standpoint, this is very little different from pursuing a federal damages action in the teeth of Congress's refusal to create a private cause of action.  Although RCRA does not preempt remedies under state law, we are at the same time disinclined to construe Congress's waiver of immunity under the FTCA to allow a suit Congress so clearly disfavored.

We conclude that a damage action under the FTCA is not available against the Navy, based on a RCRA violation.

## C.  The Noise Control Act

The plaintiffs' final argument is that the discretionary function exception is inapplicable because the Navy's live-fire exercises violated mandatory requirements imposed by the Noise Control Act ("NCA"), 42 U.S.C. § 4901-4918 (2000).  Section 4 of the NCA provides, in pertinent part, that

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the federal government –
> (1) having jurisdiction over any property or facility, or

---

[12] For example, in defending against the government's motion to dismiss, the plaintiffs state that "Puerto Rico tort law recognizes that under certain circumstances the violation of a statute or regulation can itself constitute negligence," that "the language of the FTCA does not mandate that state law be applied when the state courts themselves would be required to refer to and apply federal law to determine . . . liability," and that the district court should not "preclude Plaintiff from establishing Defendants' violations under RCRA."

-24-

> (2) engaged in any activity resulting, or
> which may result, in the emission of noise,
> shall comply with Federal, State, interstate,
> and local requirements respecting control and
> abatement of environmental noise to the same
> extent that any person is subject to such
> requirements.

42 U.S.C. § 4903(b) (2000).

The plaintiffs argue that section 4 of the NCA requires the Navy to comply with the Puerto Rico Noise Prohibition Act, which imposes a mandatory limitation on sound emissions. The Puerto Rico Noise Prohibition Act of 2001, 24 P.R. Stat. § 3635(2), provides that "[n]o person may cause or permit the emission of a sound either in air or in water which . . . propagates into the waters of Puerto Rico . . . a peak sound pressure level equal to or in excess of 190 dB re 1-m-Pa." The Puerto Rico legislature appears to have enacted this provision to deal specifically with noise emissions from the Navy's live-fire exercises on Vieques Island. See 24 P.R. Stat. § 3632 ("Findings").

The plaintiffs contend that the NCA coupled with the Puerto Rico statute constitute a mandatory directive governing the Navy's activities at the AFWTF, rendering the discretionary function exception inapplicable. We reject this contention because the NCA does not make the Puerto Rico statute applicable to the Navy. In Romero-Barceló, 643 F.2d at 854-55, this court held that section 4 of the NCA was only intended to subject the federal government to state and local "requirements" similar to "the

-25-

federal requirements enforceable under § 12 [of the NCA] . . . ." Section 12 of the NCA, codified at 42 U.S.C. § 4911 (2000), provides for citizen suits to enforce "noise control requirements." Section 12 defines "noise control requirement" by reference to:

> several provisions of the [NCA] which provide for (a) standards, rules or regulations controlling the noise emissions of motor carriers, railroads and aircraft, [42 U.S.C.] §§ 4916, 4917; 49 U.S.C. § 1431, (b) labelling regulations, 42 U.S.C. § 4907, and (c) noise emissions standards applicable to specified domestic and imported products, id. §§ 4905, 4908.

Romero-Barceló, 643 F.2d 855.

The noise that plaintiffs complain of here is generated by military weapons and ordinance. The federal requirements applicable to noise emissions by products, however, expressly exclude "any military weapons or equipment which are designed for combat use." 42 U.S.C. § 4902(3)(B)(i). Pursuant to our interpretation of section 4 of the NCA in Romero-Barceló, we conclude that the statute does not make the Puerto Rico Noise Prohibition Act applicable to the Navy's use of "military weapons or equipment," since the statute makes clear that no federal requirements are applicable to such activities. The NCA did not impose mandatory standards on the Navy's live-fire exercises.

Accordingly, we hold that the NCA does not render the discretionary function exception inapplicable.

**IV.**

In summary, we conclude that none of the plaintiffs' statutory arguments renders the discretionary function exception inapplicable. We conclude that the district court correctly dismissed the suits for lack of subject-matter jurisdiction. In light of our jurisdictional holding, we have no occasion to address the plaintiffs' statute-of-limitations or causation arguments. Because we hold that subject-matter jurisdiction was lacking as a matter of law, additional jurisdictional discovery would not have benefitted the plaintiffs, and the denial of such discovery was not error.

The decision of the district court is

<u>Affirmed</u>.